38

FILED

MAR 22 2012

POSTED ON WEBSITE

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

In re                                                    Case No. 02-17096-B-13

Gary Eickerman,

        Debtor.

_____

Gary Ulrich Eickerman,                          Adversary Proc. No. 09-01297

        Plaintiff,                               DC No. HDN-4

    v.

La Jolla Group, II,

        Defendant.

_____

**MEMORANDUM DECISION REGARDING
CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

Henry D. Nunez, Esq., appeared on behalf of the plaintiff-debtor, Gary Ulrich Eickerman.

Don J. Pool, Esq., of the Law Firm of Powell & Pool, appeared on behalf of the defendant-creditor, La Jolla Group, II.

      In this adversary proceeding, the court is asked to decide whether a debtor's completion of his chapter 13 plan and entry of his discharge necessarily satisfied an oversecured creditor's claim, that was to be paid in full through the plan, after the debtor defaulted and failed to make timely payments under the plan. Prior to this bankruptcy

case, the plaintiff-debtor, Gary Eickerman ("Eickerman"), was obligated to the defendant-creditor, La Jolla Group, II ("LJG"), pursuant to a fully secured and fully matured promissory note. Eickerman filed this bankruptcy under chapter 13 to prevent foreclosure of LJG's deed of trust against his property. The court confirmed his chapter 13 plan, which proposed to pay LJG's secured claim in full over the life of the plan with interest. After confirmation, Eickerman failed to comply with all of the terms of the promissory note and deed of trust and failed to make all of the scheduled plan payments on time. However, he eventually completed the plan and received a chapter 13 discharge. In the process, Eickerman survived three dismissal motions from the chapter 13 trustee as well as a motion for relief from the automatic stay from LJG. After entry of the discharge, this bankruptcy case was closed.

Had Eickerman made his plan payments in a timely manner and otherwise complied with the terms of the mortgage instruments, his obligation to LJG would have been satisfied at the plan's completion. However, each time Eickerman defaulted, LJG assessed and incurred a variety of fees and expenses to protect its security interest in the collateral. As a result, LJG did not apply all of the plan payments it received to principal and accruing interest on its claim as originally contemplated by the plan. Instead, some plan payments were applied to satisfy late payment penalties, attorney's fees, insurance advances, and other costs. After the case closed, LJG refused to release its deed of trust against Eickerman's property and demanded additional money from Eickerman.

Eickerman moved to reopen the bankruptcy case in order to file this adversary proceeding. The parties now move for a determination of their rights by cross-motions for summary judgment. Eickerman contends that completion of the plan and entry of the discharge fully satisfied his obligation to LJG, notwithstanding his failure to perform the plan in a timely manner and otherwise comply with his contractual obligations, and that he is now entitled to a reconveyance of LJG's deed of trust. LJG contends that it still holds a secured claim on account of the fees and expenses flowing from Eickerman's

2

1  defaults.

2      The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and 11

3  U.S.C. § 1327.[1] This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(K), and

4  (O). For the reasons stated below, the court agrees with LJG. Eickerman's motion for

5  summary judgment, seeking a reconveyance of LJG's deed of trust, will be denied.

6  LJG's motion seeking a declaration that it still holds a secured claim against Eickerman,

7  will be granted.

8  **BACKGROUND AND SUMMARY OF UNDISPUTED MATERIAL FACTS.**

9      This dispute comes before the court by way of cross-motions for summary

10  judgment. Both sides have presented their arguments and their respective statements of

11  undisputed facts. In doing so, both sides have acknowledged that there are no triable

12  issues of material fact, at least with regard to the limited issues that will be decided here.

13  Based on those motions, their supporting documents, and the court's review of the record

14  in this case and the three other chapter 13 bankruptcy cases filed by Eickerman, the

15  following facts appear to be undisputed.

16      **The Underlying Obligation.** This hotly contested dispute is best understood in

17  the context of the long and litigious relationship between the parties. For many years

18  prior to this bankruptcy, Eickerman has owned and operated a restaurant business on real

19  property located in Selma, California (the "Restaurant"). In April 1994, Eickerman and

20  his wife Wonetta Eickerman (collectively, the "Eickermans") executed an all-inclusive

21  promissory note in favor of LJG in the amount of $110,000 (the "Note").[2] The Note

22

23  _____

24  [1] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy
    Code, 11 U.S.C. §§ 101–1330, and to the Federal Rules of Bankruptcy Procedure, Rules

25  1001–9036, as enacted and promulgated *on or before* October 17, 2005, the effective date of the
    Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), Pub. L. No.

26  109-8, 119 Stat. 23 (enacted Apr. 20, 2005).

27  [2] The Note also included an unpaid balance of $80,000 due on a senior priority obligation
    in favor of Gary Sylvester. The record, however, is silent as to the status of this "included"

28

3

bore interest at 12% per annum, was payable in monthly installments of $1,100, and was to mature in May of 1999.  On the maturity date, any unpaid principal balance and accrued interest became due.

The Note contained several other contractual provisions relevant to the parties' dispute before the court.  There was a provision relating to late payment penalties, stating, "In the event of non-payment of any installment within 10 days of date due, payor [Eickerman] agrees to pay to holder [LJG] hereof a late payment charge equal to 6% of said installment."  The Note also included a provision for the award of attorney's fees in the event of a successful action to enforce the Note or collect any payments:

> If any party to this Note or any assignee of any party hereunder shall bring an action in any court of competent jurisdiction to enforce any covenant or condition of this Note, including any action to collect any payments required hereunder, it is hereby mutually agreed that the prevailing party shall be entitled to reasonable attorney's fees and all costs and expenses in connection with said action, which sums shall be included in any judgment or decree entered in such action in favor the prevailing party.

Lastly, other terms of the Note required Eickerman to make all payments due on the senior "included" obligation (as mentioned in footnote 2 supra) and to reimburse LJG for advances made for taxes and insurance on the Restaurant.

The Note was secured by an all-inclusive, second priority deed of trust against the Restaurant that the Eickermans executed together with the Note (the "DOT").[3]  The DOT included covenants that obligated the Eickermans to, *inter alia*, maintain fire insurance on the Restaurant and to pay all costs associated with protecting LJG's security interest from foreclosure by the senior lienholder.  When the Note matured in 1999 and the Eickermans failed to pay off the balance, the Note went into default and LJG

---

senior obligation.

[3] Copies of the Note and DOT are attached as exhibits to the Declaration of Alan Boyajian in Support of Motion by La Jolla Group II for Relief from the Automatic Stay at 4–9, *In re Eickerman (II)*, No. 02-17096 (Bankr. E.D. Cal. June 10, 2003), ECF No. 49 (hereinafter the "Boyajian Declaration").

4

commenced foreclosure proceedings.

**The First Chapter 13 (Case No. 00-10747).** In February 2000, the Eickermans filed a chapter 13 petition in this court (the "First Chapter 13"). M. Nelson Enmark ("Enmark") was appointed as the chapter 13 trustee. The schedules filed in the First Chapter 13 declared the value of the Restaurant to be $350,000 and showed LJG as having an oversecured claim. LJG filed a proof of claim in the amount of $99,498.43. The Eickermans confirmed a plan, over LJG's objection, that provided for full payment of LJG's claim through the plan's 60-month term. The record in the First Chapter 13 is rather uneventful until June 2002 when Enmark moved to dismiss the case. The Eickermans were more than three months behind on their plan payments and the defaults were left uncured, resulting in dismissal of the case in July 2002. The last payment that LJG received from Enmark was in March 2002.

**The Second Chapter 13 (Case No. 02-17096).** In August 2002, less than one month after dismissal of the First Chapter 13, Eickerman filed another chapter 13 case (the "Second Chapter 13"), in which this adversary proceeding is currently pending. This time, his wife was not a joint debtor. Enmark was again appointed as the standing trustee. LJG timely filed proof of its secured claim, now in the amount of $72,500 (the "Proof of Claim"). In its Proof of Claim, LJG estimated the value of its collateral to be $110,000. In his schedules, Eickerman estimated the value of the Restaurant, again, to be $350,000. LJG's Proof of Claim did not include any accounting or supporting documents to show how pre-petition payments had been applied to the Note's balance. However, Eickerman never formally objected to LJG's claim, and there was no dispute that the claim was oversecured.

Eickerman's second amended plan was confirmed on July 3, 2003 (the "Plan"),[4]

---

[4] Relevant portions of the Plan have been reproduced below in Appendix A. See Second Amended Chapter 13 Plan, *In re Eickerman (II)*, No. 02-17096 (Bankr. E.D. Cal. May 3, 2003), docket no. 38, for the complete version of the Plan.

5

after the court overruled LJG's objections to confirmation and denied its concurrent motion for relief from the automatic stay (the "First 362 Motion"). The First 362 Motion, filed in June of 2003, was supported by the Boyajian Declaration (footnote 3 supra). The Boyajian declaration stated that Eickerman's total obligation to LJG, as of June 10, 2003, had increased from the amount stated in the Proof of Claim, because of attorney's fees and insurance advances, to $88,176.27 itemized as follows:

| | |
|---|---|
| Principal Balance (as of March 29, 2002) | $ 69,088.35 |
| Interest (accrued from March 29, 2002 until June 10, 2003) | 9,948.72 |
| Advances for Insurance | 1,139.20 |
| Attorney's Fees (projected and estimated) | 8,000.00 |
| Total Claim Amount (as of June 10, 2003) | $ 88,176.27 |

At no time, did LJG amend its Proof of Claim to include the additional fees and expenses referred to in the Boyajian Declaration.

Eickerman's Plan was the Eastern District of California's form chapter 13 plan.[5] A copy of Eickerman's plan is attached hereto, in pertinent part, as Appendix A. The Plan obligated Eickerman to make monthly payments to Enmark in the amount of $2,423 for a term of 60 months. LJG's claim was provided for in Class 2 of the Plan, intended for "[s]ecured claims that are modified by this plan or that will not extend beyond its length." LJG was supposed to receive a monthly distribution from Enmark in the amount of $1,613 during the full 60-month term, and its claim, stated in the Plan as being $72,500, was to be paid in full with interest at the rate of 12%.

Eickerman defaulted on his Plan payments several times after confirmation, causing Enmark to bring three motions to dismiss. The first motion to dismiss, filed in February 2004, was based on a declaration by Enmark stating that Eickerman was already three months behind on his Plan payments. Eickerman did not respond to Enmark's motion. However, Enmark withdrew his motion at the hearing, presumably

---

[5] This district's form chapter 13 plan in effect at the time of the Second Chapter 13 was Form EDC 3-080 (revised Mar. 1, 2001), as promulgated by this district's General Order No. 01-02 (effective Mar. 1, 2001).

6

1    after Eickerman made some kind of arrangement to cure the defaults.

2        Enmark filed his second motion to dismiss in June 2004. Based on the supporting

3    declaration, Eickerman was again two months delinquent in his Plan payments. As

4    before, Eickerman, did not respond to the second dismissal motion, but the motion was

5    withdrawn by Enmark at the hearing.

6        The third motion to dismiss was filed in October 2004. Enmark's supporting

7    declaration stated that Eickerman was again in default of the Plan by three payments. At

8    the October 19 hearing, the motion was withdrawn subject to the condition, reflected in

9    the hearing minutes, that the case would be dismissed on Enmark's ex parte application

10   if Eickerman defaulted again within the next twelve months.

11       In January 2005, LJG filed its second motion for relief from the automatic stay

12   (the "Second 362 Motion"). The Second 362 Motion was based on evidence,

13   specifically Enmark's payment record, that Eickerman had failed to make Plan payments

14   to Enmark for November and December 2004 in a timely manner, notwithstanding the

15   court's ruling at the October 19 hearing. In support of its Second 362 Motion, LJG

16   argued effectively that Enmark was not enforcing the Plan:

17       as evidenced by [Enmark's] payment history . . . , [Eickerman] did not make
         his November 25 payment until November 30 and did not make his
18       December 25 payment until January 4. *For whatever reason, the "dismiss
         on declaration of the trustee" procedure is not working here* [emphasis
19       added].[6]

20       The Second 362 Motion was settled by an adequate protection order, which

21   provided LJG with ex parte relief from the automatic stay upon any further default in

22   Plan payments by Eickerman.[7] That adequate protection order did not include an award

23   of attorney's fees.

24

25       [6] Motion by La Jolla Group II for Relief from the Automatic Stay at 2, *In re Eickerman*
26   *(II)*, No. 02-17096 (Bankr. E.D. Cal. Jan. 18, 2005), docket no. 81.

27       [7] Order on Motion by La Jolla Group II for Relief from the Automatic Stay, *In re*
     *Eickerman (II)*, No. 02-17096 (Bankr. E.D. Cal. Feb. 24, 2005), ECF No. 96.
28

1    In February 2007, Enmark filed his preliminary final report indicating that the

2    Plan had been completed and that sufficient funds had been distributed over the term of

3    the Plan to pay LJG's Proof of Claim in full; specifically, LJG had received $72,500 on

4    account of principal and $25,294.75 on account of interest for a total of $97,794.75.

5    There were no objections to the Enmark's final report.  Accordingly, the court entered

6    Eickerman's discharge, and the Second Chapter 13 was closed in April 2007.

7        **The State Court Litigation.**  After the Second Chapter 13 closed, LJG refused

8    to reconvey the DOT against the Restaurant without the payment of additional money.

9    LJG demanded payment for unpaid principal, post-confirmation interest, late payment

10   penalties, advances for insurance, foreclosure fees and costs, and attorney's fees and

11   costs in the approximate amount of $24,000.[8]  When Eickerman refused to pay the

12   additional sum, LJG recorded a notice of default and commenced foreclosure

13   proceedings against the Restaurant in July 2007.

14       In November 2007, Eickerman formally requested a reconveyance of the DOT.

15   Prior to that, in September 2007, Eickerman filed a civil action against LJG in state court

16   seeking to enjoin LJG's foreclosure, an accounting, and the reconveyance of the DOT

17   (the "State Court Action").[9]  Eickerman succeeded in obtaining a preliminary injunction

18   from the state court to stop the foreclosure, and the State Court Action was set for trial in

19   March 2009.  Six days before trial, Eickerman filed another bankruptcy petition, and the

20

21

22

23       [8] The record is ambiguous as to the exact amount that LJG demanded from Eickerman

24   after conclusion of the Second Chapter 13.

25       [9] The complaint in the State Court Action was attached as an exhibit in Eickerman's

26   complaint filed in this adversary proceeding. *See* Verified Adversary Proceeding for a Finding of
     Contempt for Imposition of Damages and Sanctions for Violation of Discharge Injunction at

27   37–41, *Eickerman v. La Jolla Group, II (In re Eickerman (II))*, No. 09-1297 (Bankr. E.D. Cal.
     Dec. 22, 2009), docket no. 1.

28

8

trial date was dropped from the state court's calendar.[10]  The current status of the State Court Action is unclear from the record.

**The Third Chapter 13 (Case No. 09-11913) & The First Adversary Proceeding (AP No. 09-1156).**  In March 2009, shortly before trial in the State Court Action, Eickerman filed his third chapter 13 case, which was assigned to a different court (the "Third Chapter 13").  Michael H. Meyer ("Meyer") was appointed as the chapter 13 trustee.  In July 2009, Eickerman initiated an adversary proceeding against LJG (the "First Adversary Proceeding"), in which he sought, *inter alia*, a determination that LJG's claim had been fully satisfied and that LJG was violating the discharge injunction from the Second Chapter 13.[11]  LJG filed a responsive pleading and an objection to confirmation of a plan in the Third Chapter 13.

Eickerman was ultimately unable to confirm a plan in the Third Chapter 13.  At the confirmation hearing in August 2009, the court found, *inter alia*, that the Third Chapter 13 was not filed for the purpose of reorganization and that Eickerman's dispute with LJG should be litigated in the context of either the Second Chapter 13 or the State Court Action.[12]  Meyer then moved to dismiss the Third Chapter 13 for, *inter alia*, unreasonable delay.  Eickerman did not oppose Meyer's motion, and the Third Chapter 13 was dismissed in September 2009.  The First Adversary Proceeding was subsequently closed without a dismissal order or dispositive ruling.

---

[10] A brief history of the State Court Action is summarized in the Memorandum of Points and Authorities in Support of La Jolla Group II's Motion to Abstain from Adversary Proceeding at 2–3, *Eickerman v. La Jolla Group, II (In re Eickerman (II))*, No. 09-1297 (Bankr. E.D. Cal. Mar. 3, 2010), docket no. 35.

[11] Eickerman's discharge in the Second Chapter 13 was granted on April 3, 2007. *See* Discharge of Debtor After Completion of Chapter 13 Plan, *In re Eickerman (II)*, No. 02-17096 (Bankr. E.D. Cal. Apr. 3, 2007), docket no. 102.

[12] See Reporter's Transcript of Proceedings at 8, *In re Eickerman (III)*, No. 09-11913 (Bankr. E.D. Cal. Aug. 12, 2009), docket no. 82, for the transcribed version of the court's oral ruling.

**The Reopened Second Chapter 13 (Case No. 02-17096) & The Second Adversary Proceeding (AP No. 09-1297).** In November 2009, Eickerman moved to reopen this bankruptcy case, the Second Chapter 13, to seek resolution of his dispute with LJG. Eickerman initiated this adversary proceeding on December 22, 2009 (the "Second Adversary Proceeding").

**The Fourth Chapter 13 (Case No. 10-60233).** In September 2010, Eickerman and his wife filed another petition under chapter 13 (the "Fourth Chapter 13"), ostensibly to stay any foreclosure until Eickerman's dispute with LJG could be resolved in the Second Adversary Proceeding initiated in the reopened Second Chapter 13. Meyer was again appointed as the standing trustee. Believing that it still had a secured claim against Eickerman, LJG filed a timely proof of claim in the Fourth Chapter 13. LJG asserted a new secured claim of $79,714.59, based on the original Note and DOT detailed as follows:

| | |
|---|---:|
| Unpaid Principal | $ 19,446.36 |
| Accrued Interest | 9,225.11 |
| Late Charges (accrued through May 15, 2007) | 2,806.62 |
| Foreclosure Fees and Costs | 1,309.60 |
| Attorney's Fees and Costs (through January 10, 2011) | 46,926.90 |
| Total Claim Amount (as of January 10, 2011) | $ 79,714.59 |

Eickerman filed an amended plan in the Fourth Chapter 13, proposing to pay LJG's new secured claim in the disputed amount of $25,000. Meyer objected to confirmation and LJG joined that objection. Before the confirmation dispute could be resolved, Meyer moved to dismiss the Fourth Chapter 13 or to convert it to chapter 7. The pivotal issue that still required resolution was LJG's right to assert any claim against Eickerman after the conclusion of the Second Chapter 13. This court dropped both matters from the calendar and effectively stayed the Fourth Chapter 13 pending a final ruling on the parties' cross-motions for summary judgment in the present Second Adversary Proceeding.

/ / /

10

**ISSUES PRESENTED.**

There are three issues which must be decided and brought to some resolution before Eickerman or LJG can pursue any remedies. The first is whether Eickerman's obligation to LJG under the Note and DOT was satisfied in full upon completion of the Plan and entry of Eickerman's discharge in the Second Chapter 13, or whether LJG still retains some kind of claim. The second and third issues are dependent on the outcome of the first. If Eickerman's obligation to LJG was not fully satisfied, then the second and third issues concern the nature of the remaining claim, secured or unsecured, and the amount of the remaining claim, i.e., how much does Eickerman still owe LJG under the Note and DOT.

The first and second issues are questions of law that can be summarily decided. On these issues, there are no genuine disputes of material fact that could affect the court's determination. However, the third issue involves numerous questions of fact, such as when LJG incurred the additional fees and expenses (whether pre- or post-confirmation) and the reasonableness of LJG's expenses, such as attorney's fees. These questions cannot be decided without an evidentiary hearing. Nowhere in the record is there an accounting of what LJG has been paid, how it applied those payments, or what additional fees and expenses it has applied to the Note. For that reason, the court will address only the first and second issues here. If Eickerman's obligation to LJG was not fully satisfied upon completion of the Plan and entry of the discharge—indeed, if LJG is owed even one dollar on account of its Note and DOT—then it is appropriate to rule on the first and second issues by summary judgment. If LJG still holds a claim against Eickerman, secured or unsecured, then the amount of that claim will have to be adjudicated in another proceeding, either in the Fourth Chapter 13 or in the state court.

**DISCUSSION.**

**Summary Judgment Standard.** In an adversary proceeding, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact

11

and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a), *incorporated by* FED. R. BANKR. P. 7056.[13] "[A dispute] is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute [over a fact] is 'material' only if it could affect the outcome of the suit under the governing law." *Barboza v. New Form, Inc. (In re Barboza)*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party moving for summary judgment bears the burden of showing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). To support the assertion that a fact cannot be genuinely disputed, the moving party must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A), *incorporated by* FED. R. BANKR. P. 7056.

In response to a properly submitted motion for summary judgment, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine dispute for trial. *Barboza*, 545 F.3d at 707 (citing *Henderson v. City of Simi Valley*, 305 F.3d 1052, 1055–56 (9th Cir. 2002)). The nonmoving party cannot rely on allegations or denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery materials, to show that a dispute exists. *Id.* (citing Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991)). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

---

[13] Although Rule 56 was substantially amended in form in 2010, the advisory committee notes accompanying Rule 56 indicate that the amendments were not intended to change the substantive standard for granting summary judgment or to affect the case law construing such standard. *See* FED. R. CIV. P. 56 advisory committee's note.

1    In ruling on a summary judgment motion, the court must view all of the evidence

2 in the light most favorable to the nonmoving party. *Barboza*, 545 F.3d at 707 (citing

3 *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001)). The

4 court "generally cannot grant summary judgment based on its assessment of the

5 credibility of the evidence presented." *Agosto v. INS*, 436 U.S. 748, 756 (1978). "[A]t

6 the summary judgment stage[,] the judge's function is not himself to weigh the evidence

7 and determine the truth of the matter[,] but to determine whether there is a genuine issue

8 for trial." *Anderson*, 477 U.S. at 249.

9    When parties submit cross-motions for summary judgment on the same claim,

10 each motion must be considered on its own merits and separately reviewed under Rule

11 56. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136

12 (9th Cir. 2001). "[T]he court must consider the appropriate evidentiary material

13 identified and submitted in support of both motions, and in opposition to both motions,

14 before ruling on each of them." *Id.* at 1134. That both parties claim no genuine issues of

15 material fact exist "'does not vitiate the court's responsibility to determine whether

16 disputed issues of material fact are present.'" *Id.* at 1136 (quoting *United States v. Fred*

17 *A. Arnold, Inc.*, 573 F.2d 605, 606 (9th Cir. 1978)). The court cannot grant summary

18 judgment if a genuine issue exists as to any material fact.

19    **Identification of LJG's "Post-Petition" Claim.** To begin, the court must

20 determine whether, after confirmation and completion of the Plan and entry of the

21 discharge in Eickerman's Second Chapter 13, LJG retains any kind of claim against

22 Eickerman that it may assert in the Fourth Chapter 13 or that it may enforce under state

23 law. LJG contends that it still holds a "post-petition" claim, arising from both pre- and

24 post-confirmation events,[14] that was not provided for in Eickerman's Plan and thus not

25 affected by the discharge. LJG also contends that this claim remains secured by the

26 _____

27    [14] LJG fails to distinguish what part of its "post-petition" claim arose before and after

28 confirmation of the Plan. This distinction, however, is significant. For purposes of discussion only, the court will assume, that LJG's "post-petition" claim includes both pre- and post-confirmation elements.

13

1   Restaurant.

2       This "post-petition" secured claim arises from the various contractual provisions

3   within the Note and DOT. It is undisputed that, in addition to the provisions relating to

4   repayment of principal and interest, the Note and DOT imposed upon Eickerman several

5   other financial obligations and provided LJG with corresponding rights to payment or

6   reimbursement. These included LJG's right to assess late payment penalties, its right to

7   seek reimbursement for advances to cover taxes and insurance, its right to recover costs

8   associated with protecting its interest against the senior lienholder, and its right to

9   recover attorney's fees under a typical attorney's fee clause (collectively, "Fees and

10  Expenses"). Outside of bankruptcy, LJG's right to these Fees and Expenses was

11  generally contingent on Eickerman defaulting on his contractual obligations under the

12  Note or DOT (e.g., LJG's right to assess late fees whenever Eickerman made an

13  untimely scheduled payment). The question of whether LJG still holds any kind of

14  "post-petition" claim depends upon how the Fees and Expenses were affected by

15  confirmation of the Plan and entry of Eickerman's discharge.

16      **The Application of § 506(b).** As an oversecured creditor, LJG may rely on

17  § 506(b) to recover some of its post-petition Fees and Expenses, but not all. Section

18  506(b) of the Bankruptcy Code states that "there shall be allowed to the holder of [an

19  oversecured claim], interest on such claim, and any reasonable fees, costs, or charges

20  provided for under the agreement under which such claim arose."[15] 11 U.S.C. § 506(b)

21  (2000), *amended by* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005

22  (BAPCPA), Pub. L. No. 109-8, 119 Stat. 23. This Code provision allows a secured

23  creditor to add interest, fees, and costs to its secured claim as long as the creditor would

24  be entitled to recover them under the contract that gave rise to its secured claim.

25  However, § 506(b) has a temporal limitation, where the provision ceases to govern the

26  _____

27      [15] BAPCPA amended § 506(b) to include the phrase "or State statute" following the
    phrase "under the agreement." However, this amended Code section is inapplicable to the case
28  here, which began in 2002, since BAPCPA does not apply to cases commenced before October
    17, 2005. BAPCPA, Pub. L. No. 109-8, § 1501, 119 Stat. 23, 216.

allowance of interest, fees, and costs claimed by the oversecured creditor. Recently, the Ninth Circuit agreed with the Supreme Court's dicta in *Rake v. Wade*, where the Court stated that § 506(b) governed post-petition interest and fees only "'until the confirmation or effective date of the plan.'" *In re Hoopai*, 581 F.3d 1090, 1099 (9th Cir. 2009) (quoting *Rake v. Wade*, 508 U.S. 464, 471 (1993), *superseded by statute on other grounds*, Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, 108 Stat. 4106).

Here, LJG has only asserted that it has incurred *post-petition* Fees and Expenses, without distinguishing between those incurred before and after confirmation of the Plan. Assuming that LJG did incur pre-confirmation Fees and Expenses, they would be included in LJG's Secured Claim under § 506(b). Section 506(b) would be inapplicable in determining whether LJG was entitled to recover Fees and Expenses incurred after confirmation of Eickerman's Plan. However, whether these pre- and post-confirmation Fees and Expenses survived confirmation of the Plan is a separate issue, which is addressed further below.

**Due Process and the Effect of Confirmation of Eickerman's Plan.** LJG contends that it still has a right to recover all post-petition Fees and Expenses arising from Eickerman's defaults under the Plan and the Note and DOT. LJG argues that the Plan did not modify this right. In analyzing LJG's argument, the court must look to the Plan itself and determine what effect the Plan had on any of LJG's preexisting contractual rights.

Section 1327 of the Bankruptcy Code states that the "provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan." § 1327(a). Typically, the binding effect of plan confirmation refers to the res judicata effect on issues pertaining to the plan that were or could have been raised before confirmation. *Enewally v. Wash. Mut. Bank (In re Enewally)*, 368 F.3d 1165, 1172 (9th Cir. 2004). This means that if a creditor fails to object to a plan or appeal a confirmation order, "it cannot later complain about a certain provision

15

contained in a confirmed plan, even if such a provision is inconsistent with the Code." *Great Lakes Higher Educ. Corp. v. Pardee (In re Pardee)*, 193 F.3d 1083, 1086 (9th Cir. 1999) (citation omitted) (internal quotation marks omitted). But, as the Ninth Circuit Bankruptcy Appellate Panel ("BAP") has observed, "Another way of looking at the binding effect of confirmation is that the plan is a contract between the debtor and the debtor's creditors." *In re Than*, 215 B.R. 430, 435 (9th Cir. BAP 1997) (citing *In re Richardson*, 192 B.R. 224, 228 (Bankr. S.D. Cal. 1996)). A plan, as a contract, is intended to set forth the rights of the debtor and his creditors.

Here, the Plan addressed payment of LJG's Proof of Claim in the amount of $72,500, but the Plan remained silent about whether LJG would maintain any of its other contractual rights, such as its right to recover post-petition Fees and Expenses as provided by the Note and DOT. The question then becomes, in the absence of the Plan's explicit modification of some rights embodied in the Note and DOT, did those rights survive confirmation? Or did the Plan supersede all rights arising from the contract documents, limiting LJG to only the rights affirmatively mentioned in the Plan?

The inquiry begins with Code § 1322 which allows a debtor to "modify the rights of holders of secured claims . . . or leave unaffected the rights of holders of any class of claims" in his plan. § 1322(b)(2). The "rights" mentioned in § 1322(b)(2) include the rights "reflected in the relevant mortgage instruments, which are enforceable under [state] law." *Nobelman v. Am. Sav. Bank*, 508 U.S. 324, 329–30 (1993) (mentioning various rights arising from mortgage instruments that are subject to § 1322(b)(2), such as the right to monthly payments of principal with interest and the right to retain a lien until the debt is paid off). Here, Eickerman's Plan did modify some of LJG's rights; specifically, it modified the Note and DOT to prevent a foreclosure and to allow monthly payments over the Plan's term on a debt that had already fully matured. *See In re Seidel*, 752 F.2d 1382, 1383–84 (9th Cir. 1985) (reasoning that such treatment on an already matured debt amounts to a modification under § 1322(b)(2) and not curing of default). However, the Plan did not explicitly mention or purport to modify in any way LJG's

16

1  right to recover Fees and Expenses which may arise under the Note and DOT while

2  Eickerman performed the Plan.

3      Some courts have treated the confirmed plan as entirely replacing the parties' pre-

4  petition contracts and rights therein. *See, e.g., In re Wellman*, 322 B.R. 298, 301 (B.A.P.

5  6th Cir. 2004) ("Once a plan is confirmed, it is treated as the *exclusive and transcendent*

6  *relationship* between the debtor and the creditor." (emphasis added)); *In re Talbot*, 124

7  F.3d 1201, 1209 (10th Cir. 1997) ("[B]ecause creditors are limited to those rights that

8  they are afforded by the plan, they may not take actions to collect debts that are

9  inconsistent with the method of payment provided for in the plan." (citations omitted)

10  (internal quotation marks omitted)). In this circuit, the BAP has taken a different

11  approach. Considering a plan's treatment of secured claims, the BAP has focused on the

12  secured creditor's due process rights and has adopted an approach that considers the

13  sufficiency of notice and the totality of the circumstances. *In re Shook*, 278 B.R. 815,

14  824–25 (9th Cir. BAP 2002) ("Due Process is the linchpin to determining the rights of

15  secured creditors in chapter 13."). With due process in mind, the BAP has construed

16  ambiguities in a plan against the debtor-drafter. *See Cnty. of Ventura Tax Collector v.*

17  *Brawders (In re Brawders)*, 325 B.R. 405, 411 (9th Cir. BAP 2005), *aff'd sub nom.*

18  *Brawders v. Cnty. of Ventura (In re Brawders)*, 503 B.R. 856 (9th Cir. 2007) (adopting

19  the BAP's decision in its entirety); *Shook*, 278 B.R. at 826.

20      Considering the BAP's emphasis on due process, the court concludes that

21  Eickerman's Plan did not modify or eliminate LJG's contractual right to recover Fees

22  and Expenses given the Plan's complete failure to mention such rights and its lack of an

23  integration or merger clause,[16] which would have had the effect of superseding the

24  provisions in the Note and DOT. A plan provision affirmatively eliminating these rights

25  would have provided the creditor with the most adequate notice that the plan would be

26

27  ────────────────

28  [16] "Integration" or "merger" refers to "[t]he full expression of the parties' agreement, so
that all earlier agreements are superseded, the effect being that neither party may later contradict
or add to the contractual terms." BLACK'S LAW DICTIONARY 880 (9th ed. 2009).

modifying or affecting the creditor's rights. *Cf. In re Sanders*, 243 B.R. 326, 329

(Bankr. N.D. Ohio 2000) (binding creditor to terms of confirmed plan, which stated that

"all secured creditors shall also not be entitled to recover attorney fees in this case for

any reason, including proceedings upon or after default of any provision herein by the

debtor, and waive their right to same.").

      The Plan did not explicitly modify any of LJG's rights to Fees and Expenses, and

neither did it modify those rights implicitly or indirectly. *Cf. Rake*, 508 U.S. at 473 n.9

("When a plan cures a default and reinstates payments on a claim, the creditor's

contractual rights arising from the default—which in this case included the right to . . .

foreclose on the property—are implicitly abrogated and therefore 'modified.'" (citation

omitted)). Here, the extension of monthly payments on account of LJG's already

matured claim necessarily modified LJG's right to foreclose on the Restaurant, without

the Plan explicitly providing so. However, as to LJG's rights to Fees and Expenses,

there was no provision in the Plan that could be reasonably construed as modifying or

eliminating these rights. Without any "modification" language in the Plan, LJG was not

afforded notice that its right to recover Fees and Expenses was being abrogated.

Therefore, the Plan did not affect LJG's rights to Fees and Expenses.

      This conclusion is also supported by the language of the Bankruptcy Code.

Returning again to § 1322, it provides the debtor with the ability to "modify the rights of

holders of secured claims . . . *or leave unaffected* the rights of holders of any class of

claims" in his plan. § 1322(b)(2) (emphasis added). The debtor's plan options under

this subsection are not mutually exclusive. *See* § 102(5) (providing that the statutory

term "'or' is not [meant to be] exclusive"). So it is clear, that even though Eickerman's

Plan modified *some* of LJG's rights, it did not necessarily modify *all* of LJG's rights.

Section 1322(b)(2) does not provide for such rigid treatment, and instead, the court

interprets this subsection to permit the debtor to modify some of a creditor's rights while

leaving the rest of its rights unaffected. Thus, the appropriate way of reading and

applying § 1322(b)(2) to this case would be to view the Plan as modifying and

18

superseding only the terms under the Note and DOT relating to payment of the principal debt but leaving wholly intact the other contractual terms, namely those relating to LJG's right to recover Fees and Expenses.

**The Effect of the Discharge: What Was "Provided for" by the Plan?** Given that LJG retained its rights to assess post-petition Fees and Expenses, both pre- and post-confirmation, the court must now consider how those Fees and Expenses were affected by Eickerman's discharge. Section 1328 of the Bankruptcy Code provides that "as soon as practicable after completion by the debtor of all payments under the plan . . . the court shall grant the debtor a discharge of *all debts provided for by the plan* or disallowed under [§ 502]," with some exceptions. § 1328(a) (emphasis added). Eickerman received his discharge under § 1328 in 2007, after he completed his Plan payments. The question then becomes, what exactly was discharged, that is, which "debts" were "provided for" by the Plan and were therefore subject to discharge?[17]

Unlike in a chapter 7 case, where the dischargeability of a particular debt depends on *when* that debt *arose, Siegel v. Fed. Home Loan Mortg. Corp.*, 143 F.3d 525, 532 (9th Cir. 1998), the discharge of a debt in chapter 13 depends on whether the *plan provides for* the particular claim. *Compare* § 727(b) (discharging "all debts that arose before the date of the [filing of the petition]"), *with* § 1328(a) (discharging "all debts provided for by the plan"). The phrase "provided for by the plan" in § 1328(a) "means that a plan 'makes a provision' for, 'deals with,' or even 'refers to' a claim." *Rake*, 508 U.S. at 474 (citation omitted) (reasoning that claims modified under § 1322(b)(5) were provided for by the plan given § 1328(a)(1)'s explicit reference to § 1322(b)(5) debts as exception to discharge); *accord Lawrence Tractor Co. v. Gregory (In re Gregory)*, 705 F.2d 1118, 1122 (9th Cir. 1983) (holding that a plan proposing to pay nothing on unsecured claims,

---

[17] A "debt" is defined as a "liability on a claim," and a "claim" is defined as a "right to payment." §§ 101(5)(A), (12). The meanings of "debt" and "claim" are intended to be coextensive. *See Pa. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 558 (1990), *superseded by statute on other grounds*, Criminal Victims Protection Act of 1990, Pub. L. No. 101-581, 104 Stat. 2865, *as recognized in Johnson v. Home State Bank*, 501 U.S. 78 (1991).

or "zero-payment plan," nevertheless "provided for" unsecured creditor's claim). Here, it is undisputed that the Plan referred to and provided for the debt underlying LJG's Proof of Claim, the Plan specifically named LJG as a secured creditor of Class 2. The Plan provided that each Class 2 secured claim "will be paid its full amount . . . together with interest." However, the Plan's bare reference to LJG as a creditor does not mean that the Plan broadly "provided for" *every* debt in *any* amount owed at *any* time to LJG. *But see Work v. Cnty. of Douglas (In re Work)*, 58 B.R. 868, 871 (Bankr. D. Or. 1986) (opining that simply "[b]y adding the name of the [creditor] to [section addressing secured claims]," debtor would have "provided for" secured claim and lien).

To determine how the Plan dealt with LJG, the court must determine what the provisions of the Plan, as a contract, should fairly be interpreted to accomplish. *See Hillis Motors, Inc. v. Haw. Auto. Dealers Ass'n*, 997 F.2d 581, 588 (9th Cir. 1993) (stating that a plan of reorganization should be construed as a contract). Only two results, which are mutually exclusive, may follow from this analysis; either LJG's right to recover Fees and Expenses constitutes an element of LJG's claim already provided for in the Plan and subject to discharge, or the Fees and Expenses constitute a separable post-petition obligation not specifically provided for by the Plan and excepted from the discharge. In interpreting the Plan's language, the court bears in mind that ambiguities in a plan should be construed against the debtor-drafter. *See Brawlers*, 325 B.R. at 411; *Shook*, 278 B.R. at 411.

At first glance, since the Plan referred specifically to the sum of $72,500 as the "claim amount" for LJG's claim, the Plan appeared to only provide for the matured and outstanding debt owed to LJG on the petition date. The court assumes that Eickerman intended to follow the form plan's printed directions, which instruct a debtor to include in the "claim amount" "the unmatured principal, the accrued but unpaid principal and interest *through the date of bankruptcy*, as well as other *accrued and unpaid charges* such as attorneys' fees and foreclosure costs." This language would seem to suggest that the Plan would only "provide for" claims that had accrued pre-petition while not

20

affecting anything that accrued post-petition. The stated claim amount of $72,500 in the Plan matched the figure in LJG's Proof of Claim, which represented the full debt matured and outstanding as of the petition date. It also represented the full debt in the record owed to LJG at the time of Plan confirmation. Based on these considerations, the court could then interpret the Plan as requiring that the "full amount [of the known debt to LJG] . . . together with interest" be provided for through the Plan.

However, on a different page in a separate section, the Plan further provided, "Unless a claim objection is sustained . . . distributions on account of [Class 2 claims] will be based upon the amount stated in each claim holder's proof of claim *rather than the amount estimated by Debtor in this plan*." Based on this provision, the claim amount stated in the Plan, was not binding on the parties. Rather, this Plan provision dictated that whatever was stated in LJG's Proof of Claim would bind the parties as the Plan's "provided for" claim. Given that the Plan's treatment of LJG was keyed to LJG's Proof of Claim, Eickerman could not modify the amount of LJG's claim through one of the Plan provisions. His only recourse to modify the claim amount would be through a formal claim objection. In the absence of a claim objection, the Plan's deference to the "amount stated in [the] proof of claim" shifted the burden to LJG to provide the proper claim amount in its Proof of Claim, as that amount would ultimately bind the parties as to what the Plan "provided for."

A proof of claim may be filed by a creditor, which is any "entity that has a *claim* against the debtor that *arose at the time of or before the [petition date]*." §§ 101(10)(A), 501(a) (emphasis added). Once such proof is filed, the claim is deemed allowed unless a party in interest files a claim objection. § 502(a). What constitutes a "claim" under the Code is fairly extensive, being broadly defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, *contingent*, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." § 101(5)(A) (emphasis added). As the Ninth Circuit has reasoned, the "broadest possible definition of claim is designed to ensure that all legal obligations of the debtor, *no matter how*

21

*remote or contingent*, will be able to be dealt with in the bankruptcy case." *Cal. Dep't of Health Servs. v. Jensen (In re Jensen)*, 995 F.2d 925, 929 (9th Cir. 1993) (emphasis in original) (citations omitted) (internal quotation marks omitted) (discussing breadth of term "claim" in context of discharged debt under chapter 7); *see also Johnson*, 501 U.S. at 83 (reiterating that Congress intended for broadest possible definition for claim subject to inclusion in chapter 13 plan). Thus, a "claim" for bankruptcy purposes will even include a contingent claim, meaning "one which the debtor will be called upon to pay only upon the occurrence of happening of an extrinsic event which will trigger the liability of the debtor to the alleged creditor." *Fostvedt v. Dow (In re Fostvedt)*, 823 F.2d 305, 306 (9th Cir. 1987).

In determining when a claim arises under the Bankruptcy Code, particularly whether it arises before the petition date, federal law controls. *Siegel*, 143 F.3d at 532. The Ninth Circuit has adopted the "fair contemplation" approach, which looks to whether the debtor and creditor could fairly contemplate a potential claim on the petition date based upon their pre-petition relationship or conduct. *See Jensen*, 995 F.2d at 930–31 (determining when environmental claim arose). In the context of a claim arising out of a contractual relationship, that claim arises when the parties execute the contract, not when the contingency triggering the claim occurs. *See Emps.' Ret. Sys. of Haw. v. Osborne (In re THC Fin. Corp.)*, 686 F.2d 799, 803–04 (9th Cir. 1982) (determining when indemnification claim arose). Here, it appears that LJG's contingent right to recover Fees and Expenses, though accruing post-petition, arose before the petition date, specifically in 1994 when the parties executed the mortgage instruments which established those rights in the Note and DOT. It would follow then that LJG's "post-petition" Fees and Expenses are actually part of its pre-petition claim.

However, simply because LJG's post-petition Fees and Expenses may constitute an element of its pre-petition claim, this does not necessarily mean that the Plan should be construed as "providing for" all of those Fees and Expenses. It is true that the Plan deferred to LJG's Proof of Claim and what debts may be included in a proof of claim is

22

1    broadly construed.  Nevertheless, the scope of what the Plan actually "provided for"

2    must be limited by the circumstances at the time of confirmation, particularly by what the

3    parties at that time could fairly contemplate or understand the Plan to cover.  Otherwise,

4    a plan can "provide for" something so remote or expansive that the parties, especially the

5    creditor, would have no way of knowing the plan's limitations.  *Cf. Enewally*, 368 F.3d

6    at 1173 ("[A] confirmed plan has no preclusive effect on issues that . . . were not

7    sufficiently evidenced in a plan to provide adequate notice to the creditor." (citation

8    omitted)).  At the time that the court confirmed Eickerman's Plan, he and LJG could

9    have only contemplated that the Plan would "provide for" the debt that had already

10   matured and was actually owed as of the date of confirmation.  This would include the

11   pre-confirmation Fees and Expenses.  Any Fees and Expenses accruing after

12   confirmation would have been outside of the parties' understanding.

13        Obviously, this means that the Plan "provided for" the matured debt outstanding

14   on the *petition date*, and LJG properly accounted for this debt of $72,500 in its Proof of

15   Claim.  But this also means that LJG's right to recover additional Fees and Expenses,

16   those which accrued between the petition date and the confirmation date, were also

17   "provided for" by the Plan.  At the commencement of the case, those payment rights

18   were still contingent, but once Eickerman began defaulting on his obligations under the

19   Note and DOT during the pre-confirmation period, LJG's contingent rights to payment

20   became fixed or absolute.  When the Plan was confirmed, the parties should have

21   contemplated the existence of the pre-confirmation Fees and Expenses since, by that

22   time, the contingency events (i.e., Eickerman's defaults of his contractual obligations)

23   had already happened.

24        Since the pre-confirmation Fees and Expenses were well within LJG's knowledge

25   by the time of confirmation, LJG should have filed an amended proof of claim before the

26   Plan was confirmed to include those additional sums.  *See In re Atwood*, 293 B.R. 227,

27   232 (9th Cir. BAP 2003) (holding that filing proof of claim was appropriate procedural

28   vehicle for § 506(b) fees); *see also In re Sambo's Rests., Inc.*, 754 F.2d 811, 816–17 (9th

Cir. 1985) (Unless it would cause undue prejudice to the opposing party, "the bankruptcy courts, as courts of equity, should freely allow amendments to proofs of claim that relate back . . . when the purpose is to cure a defect in the claim as filed or to describe the claim with greater particularity."). The filing of an amended proof of claim would have put Eickerman on notice that LJG was demanding more than $72,500. An amended proof of claim would have also had the effect of requiring that Eickerman modify the Plan before confirmation to increase the Plan payments to provide for the amended claim. *See In re Hobdy*, 130 B.R. 318, 322 (9th Cir. BAP 1991) (Perris, J., concurring) (reasoning that where proof of claim controlled over plan, debtor who completed plan payments could not compel satisfaction of lien until payment of full amount of allowed secured claim under § 502). Any dispute over the amount of then owed to LJG could have been resolved through a timely claim objection. *See In re Kincaid*, 316 B.R. 735, 741–42 (Bankr. E.D. Cal. 2004) (positing that when proof of claim is higher than the plan expected, a debtor would need to file claim objection or plan modification as to not jeopardize discharge).

Since the Plan deferred to LJG's Proof of Claim and nothing barred LJG from adding its pre-confirmation Fees and Expenses to an amended proof, it follows that the Plan necessarily "provided for" all sums owed to LJG at the time of confirmation. The effect of LJG's failure to amend its Proof of Claim prior to confirmation was to make Eickerman's repayment of $72,500, the figure stated in the Proof of Claim, represent the full satisfaction of LJG's "provided for" claim under the Plan. And this "provided for" claim, to LJG's detriment, encompassed any debt owed and outstanding at the time of confirmation. By failing to amend its proof of claim to include pre-confirmation Fees and Expenses, LJG waived any right to recover these sums after Eickerman completed his obligations under the Plan and the discharge was entered. By failing to provide Eickerman with an updated statement of the amount owed at confirmation, LJG effectively consented to accept less than the amount then owed in full satisfaction of the claim.

24

When a plan defers to a proof of claim, the debtor has the right to rely, without penalty, on such proof, which the debtor accepts as the amount owed and outstanding at the time of confirmation. Otherwise, a debtor is punished when a secured creditor purposefully, or negligently, asserts a smaller amount in its proof and later contends that the plan failed to pay the full amount of its actual claim. Such a result would be inequitable to the debtor. Therefore, now that Eickerman has completed his Plan payments and the discharge has been entered, LJG is precluded from asserting its claim for pre-confirmation Fees and Expenses. Any Fees and Expenses that accrued prior to confirmation were "provided for" by the Plan and have since been discharged under § 1328.

By the same reasoning LJG's *post-confirmation* Fees and Expenses were not "provided for" under the Plan and were not subject to the discharge. Unlike LJG's pre-confirmation Fees and Expenses, the right to recover post-confirmation Fees and Expenses was still contingent at the time of confirmation. At that time, Eickerman had not committed any post-confirmation defaults. The parties could not have fairly contemplated the Plan to "provide for" post-confirmation Fees and Expenses that had not yet become due and owing. And, at the time of confirmation, there was even a possibility, indeed an expectation, that post-confirmation Fees and Expenses would never materialize during the Plan's term as Eickerman should have performed the Plan without defaulting. Even though Eickerman had a long history of failing to comply with his obligations, both as a party to his contracts and as a debtor in chapter 13, the parties had no reasonable way of knowing at confirmation whether post-confirmation Fees and Expenses would accrue. Even assuming they would accrue, the Plan could not adequately estimate and provide for such contingent future sums. The Plan therefore could not have "provided for" LJG's post-confirmation Fees and Expenses.

Arguably, at confirmation, LJG could have fairly contemplated that it would have a claim for post-confirmation Fees and Expenses based on Eickerman's long, pre-petition history of defaults under the Note and DOT. However, while LJG could have

25

anticipated the more-than-likely existence of this future claim, it does not necessarily follow that the parties intended the Plan to provide for it. Rather, at confirmation, the parties both had a right to assume—indeed, the right to expect—that Eickerman would timely and fully perform under the Plan, without defaulting on any of his contractual obligations. If Eickerman had done what he was obligated to do under the Plan or the Note and DOT, there would not have been any post-confirmation Fees and Expenses owing at the Plan's completion.

If the court were to hold that the Plan did provide for post-confirmation Fees and Expenses, while failing to recognize any sort of supplemental remedy for Eickerman's defaults, then such a ruling would essentially allow Eickerman to disregard his contractual obligations without having to suffer any of the financial consequences normally associated with such defaults. Since the court has already concluded that the Plan left intact LJG's right to recover post-confirmation Fees and Expenses, then a ruling that does not require Eickerman to pay that additional debt would have the simultaneous effect eliminating those rights. Such a result would be both inconsistent and inequitable.

Finally, to read the Plan as "providing for" LJG's post-confirmation Fees and Expenses would impose an affirmative, post-confirmation duty on LJG to act when no such duty exists. If the Plan had provided for the post-confirmation Fees and Expenses, then LJG would have been required to return to the court each time Eickerman defaulted on one of his obligations and to request the Plan be modified to compensate for the default. Not only would this practice be burdensome to all parties involved in both time and expense, but it is unclear whether LJG even had the ability to request such relief. The Code does not explicitly confer standing upon a secured creditor to move for modification of an already-confirmed plan. *See* § 1329(a) (limiting standing to request plan modification to only "the debtor, the trustee, or the holder of an allowed unsecured claim"); *In re Stewart*, 247 B.R. 515, 520 (Bankr. M.D. Fla. 2000). Given all of these considerations, the court cannot reasonably interpret the Plan to have "provided for" LJG's post-confirmation Fees and Expenses. Accordingly, LJG's post-confirmation

26

Fees and Expenses were not discharged in the Second Chapter 13 and still constitute a separate claim that LJG may assert against Eickerman in the Fourth Chapter 13.

**Preservation of LJG's Lien Rights.** Finally, the court will consider whether the Plan or the discharge had any effect on LJG's lien against the Restaurant. As commonly understood, a discharge does not erase or satisfy a debt, but rather, it "extinguishes only one mode of enforcing a claim—namely, an action against the debtor in personam—while leaving intact another—namely, an action against the debtor in rem." *Johnson*, 501 U.S. at 84. It is undisputed that had Eickerman fully performed the Plan, without any further events of default, then his obligations to LJG would have been fully satisfied and Eickerman would have been entitled to reconveyance of the DOT against his Restaurant. But that right to reconveyance is a function of state law, based on satisfaction of the underlying claim, it is not a function of the bankruptcy discharge.

The discharge in bankruptcy has no effect on a secured creditor's lien if the underlying debt is not satisfied. The discharge relates only the debtor's personal liability. The effect of the discharge is explained in § 524 as follows:

(a) A discharge in a case under this title—

(1) voids any judgment at any time obtained, to the extent that such judgment is a determination of the *personal liability of the debtor* with respect to any debt discharged under [§ 1328], whether or not discharge of such debt is waived;

(2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover, or offset any such debt as a *personal liability of the debtor*, whether or not discharge of such debt is waived[.]

§ 524(a) (emphasis added). "The discharge of [a debtor's] personal liability, if any, to [a secured creditor] does not [however] effect the right of [the creditor] to enforce its lien against the [debtor's] real property." *Work*, 58 B.R. at 873. While the discharge has no effect on a creditor's lien, the Bankruptcy Code nevertheless "empowers chapter 13 debtors to 'provide for' and manage liens *through the plan*." *Shook*, 278 B.R. at 823 (emphasis added).

27

It is a longstanding principle in bankruptcy that "a secured creditor may bypass a debtor's bankruptcy proceedings and enforce its lien in the usual way, because unchallenged liens pass through bankruptcy unaffected." *Id.* at 821 (citing prior Supreme Court cases); *accord Brawders*, 325 B.R. at 416 ("[U]nlike unsecured creditors, secured creditors may ignore the bankruptcy proceedings and look to the lien for satisfaction of the debt." (citation omitted)).  However, the Code permits a debtor to propose a plan that modifies a secured creditor's lien rights. *See* § 1322(b)(2) (allowing debtor to "modify the rights of holders of secured claims"); *Shook*, 278 B.R. at 824 (acknowledging that plan can effectively value and avoid lien when adequate notice given to creditor); *see also In re Murry-Hudson*, 147 B.R. 960, 962 (Bankr. N.D. Cal. 1992) ("Giving [§ 1322(b)(2)] its plain meaning, it must be concluded that a Chapter 13 debtor is permitted not merely to alter the amount and terms of payment of her secured debts, but to hold the property free and clear of liens after paying the allowed secured claims in accordance with the provisions of her confirmed plan.").

Although the plan binds the debtor and the secured creditor, "this does not mean that a debtor can void or otherwise extinguish a creditor's lien without addressing the lien in the plan." *Shook*, 278 B.R. at 824.  The plan "provides for" that lien by acknowledging the lien interest and by making explicit provisions for the treatment of such interest. *Work*, 58 B.R. at 871 (citing *Lawrence Tractor Co. v. Gregory (In re Gregory)*, 19 B.R. 668, 669–70 (9th Cir. BAP 1982), *aff'd*, 705 F.2d 1118 (9th Cir. 1983)).  But "[a] plan that is silent about the fate of a secured claim provides no notice of what will happen to the secured claim and therefore cannot effectively avoid a lien or determine its value" or otherwise modify that lien. *Shook*, 278 B.R. at 824 (citations omitted).  As highlighted before, adequate notice is fundamental to satisfying due process, and "Due Process is the linchpin to determining the rights of secured creditors in chapter 13." *Id.* at 825.

The court must also consider whether a plan's provisions address a lien because any explicit lien treatment will affect the vesting of property under § 1327.  Under the

28

Bankruptcy Code, property of the estate vests in the debtor at confirmation unless the plan provides for vesting at a later time. *See* §§ 1322(b)(9), 1327(b). Here, one of the Plan's provisions clearly states, "Any property of the estate scheduled under 11 U.S.C. § 521 shall . . . not revest in Debtor until such time as a discharge is granted." It follows that property vested in Eickerman upon the entry of his discharge in 2007, and the vested property would seem to include the Restaurant encumbered by LJG's lien.

The Code then provides that at the time property of the estate does vest in the debtor, "[e]xcept as otherwise provided in the plan," the vesting occurs "free and clear of any claim or *interest* of any creditor *provided for by the plan*."[18] § 1327(c) (emphasis added). Although "interest" is not defined by the Code, a "lien" is statutorily defined as a "charge against or *interest in property* to secure payment of a debt or performance of an obligation." § 101(37) (emphasis added). Thus, it follows that property vests in the debtor free and clear of any lien mentioned in the plan *unless* a plan provision specifically provided some other treatment for such lien. *See Brawders*, 325 B.R. at 415–16; *Work*, 58 B.R. at 871. Once again, the court comes back to the issue of what exactly the Plan "provided for," but now the focus turns to LJG's DOT against the Restaurant. For this analysis, the court must consider whether LJG's lien was mentioned in the Plan and, if so, how did the Plan intend to treat the lien (i.e., whether the Plan modified LJG's lien rights).

Here, the Plan, at the very least, acknowledged that LJG held a lien. It did so by properly listing LJG as a secured creditor within Class 2, which was intended for "*[s]ecured claims* that are modified by this plan or that will not extend beyond its length." *See Shook*, 325 B.R. at 825 (holding that debtor's failure to acknowledge secured claim in plan by listing such claim as unsecured in schedules failed to meet due process requirements to extinguish lien); *Work*, 58 B.R. at 871 (finding that plan did not extinguish lien when plan classified secured claim as priority claim).

---

[18] In interpreting § 1327(c), the court reads the phrase "provided for by the plan" to modify the terms "claim" and "interest," rather than the term "creditor."

29

As to the treatment of LJG's lien, the Plan indirectly addressed the lien, stating "Each secured claim [in Class 2] will continue to be secured by its existing lien or security interest and will be paid its full amount . . . together with interest," and then the "full amount" to be paid to a Class 2 claim "will be based upon the amount stated in each [Class 2] claim holder's proof of claim rather than the amount estimated by Debtor in this plan." The Plan mentioned a Class 2 creditor's "existing lien" but still failed to affirmatively address the issue of lien extinguishment. For example, the Plan did not unambiguously provide that "LJG will surrender its lien against Eickerman's property upon full payment of its allowed secured claim." *See Murry-Hudson*, 147 B.R. at 961–62 (finding that Plan's language stating, "Secured creditors shall retain their liens until their allowed secured claims have been paid," could only mean creditor's lien rights were extinguished once allowed secured claim was paid in full). Lacking such explicit and direct language, it appears then that the Plan, on its face, did not address how the Class 2 creditors' liens would be treated upon the Plan's completion and the entry of discharge.

Eickerman contends that completion of all Plan payments and full payment of $72,500 with interest to LJG were enough to extinguish LJG's lien against the Restaurant. As discussed above, payment of $72,500 with interest, the claim amount provided in LJG's Proof of Claim, represented satisfaction of LJG's "provided for" claim.[19] Under Eickerman's interpretation, once LJG's Proof of Claim was satisfied, LJG was obligated to release its lien, despite being entitled to recover post-confirmation Fees and Expenses. Eickerman essentially argues that the post-confirmation Fees and Expenses now represent an unsecured claim which he can provide for in his Fourth Chapter 13.

---

[19] To reiterate what was discussed in an earlier section, the court's use of the phrase "'provided for' claim" is intended to mean LJG's claim that had matured and was outstanding at the time of confirmation. Thus, the phrase, as used in this analysis, specifically excludes any claim for *post-confirmation* Fees and Expenses.

30

1    Eickerman did pay LJG's entire "provided for" claim through the Plan, but

2    satisfaction of the "provided for" claim is not the issue here. Rather, the issues are

3    whether any of the Plan's provisions required release of the lien upon payment of the

4    "provided for" claim, and, if so, whether the provisions stated this in a manner clear

5    enough to afford LJG sufficient notice that the Plan would be affecting its lien rights.

6    After careful consideration of the Plan in its entirety, the court finds that the Plan did *not*

7    require LJG to release its lien upon payment of its "provided for" claim.[20] Instead, the

8    court interprets the Plan to mean LJG would retain its security interest in the Restaurant

9    until the entire underlying debt is satisfied. As a direct result of Eickerman's post-

10   petition default, that underlying debt now includes LJG's post-confirmation Fees and

11   Expenses.

12       One case from this circuit, *In re Murry-Hudson*, 147 B.R. 960, lends some

13   support for Eickerman's interpretation of the Plan, but that case is distinguishable from

14   this case in one material respect. In *Murry-Hudson*, the debtor bifurcated a secured

15   creditor's claim secured by the debtor's vehicle into secured and unsecured claims for

16   the purpose of stripping down the creditor's lien through the plan. *Id.* at 961. The

17   confirmed plan unambiguously stated, "Secured creditors shall retain their liens until

18   their allowed secured claims have been paid." *Id.* Given the clear language, the

19   bankruptcy court determined that once the crammed-down secured claim was paid in full

20   to the creditor, which the debtor accomplished prior to completing the rest of the plan,

21   the creditor's lien rights against the vehicle ceased to exist. *Id.* at 962. As a result, the

22   creditor had to turn over the certificate of title to the debtor. *Id.* The court further

23   reasoned that without such language in the plan, the same result would have nevertheless

24   occurred due to the operation of § 1322(b)(2). *Id.* This Code provision, allowing

25   modification of a secured creditor's rights through a plan, permitted the debtor to hold

26

27   _____

28       [20] Because the court interprets the Plan in a way favorable to LJG and its lien
rights, the court does not need to address the issues of due process and adequate notice.

31

property free and clear of the encumbering lien once the debtor fully paid the secured claim in the plan. *Id.*

Although the *Murry-Hudson* court concluded that a secured creditor was required to release its lien after payment of its secured claim, the distinguishing fact in the case is that it dealt with a bifurcated, undersecured claim that the debtor could lien strip or cram down through the plan. In a typical lien stripping case where a plan utilizes the provisions of §§ 506(a), 1322(b)(2), and 1325(a)(5),[21] the result is "'the secured creditors' lien only secures the value of the collateral and to the extent property is distributed of a present value equal to the allowed amount of the creditor's secured claim the creditor's lien will have been satisfied in full.'" *In re Mandrayar*, 174 B.R. 289, 293 (Bankr. S.D. Cal. 1994) (emphasis added) (quoting 124 CONG. REC. H11,107 (daily ed. Sept. 28, 1978)). Through bifurcation and lien stripping, an undersecured creditor's lien rights are necessarily affected and modified by the plan. *See Enewally*, 368 F.3d at 1172 ("[S]tripping down an undersecured lien to the value of the underlying collateral pursuant to § 506(a) valuation 'would require a modification of the rights of the holder of the security interest.'" (quoting *Nobelman*, 508 U.S. at 332)). This is because bifurcation and lien stripping acknowledge that part of the creditor's lien is invalid as there is nothing for the unsecured portion of the lien to attach to. *Cf. In re Lam*, 211 B.R. 36, 40 (9th Cir. BAP 1997) ("Nothing secures the 'right' of the lienholder . . . to retain the lien until the debt is paid off . . . if there is no security available to the lienholder. . . .").

Here, the situation is distinguishable since Eickerman's obligations to LJG have always been *oversecured* and there was no effort to bifurcate LJG's claim into secured and unsecured parts. However, Eickerman still wishes to treat his remaining obligation as undersecured. His interpretation of the Plan effectively results in the cram down of

---

[21] The prior version of § 1325(a)(5), applicable at the time of this case, required the "plan [to] provide[ ] that the holder of [an allowed secured claim provided for by the plan] retain the lien securing such claim." § 1325(a)(5)(B)(i) (2000), *amended by* BAPCPA, Pub. L. No. 109-8, 119 Stat. 23.

32

LJG's secured claim to $72,500 and the stripping of LJG's lien from the Restaurant at the Plan's completion. Yet, the process by which debtors deal with undersecured claims in a plan would not occur with oversecured claims because the Code prohibits debtors from bifurcating oversecured claims, where there is enough equity in the collateral to secure the entire amount of the claim. *See* § 506(a). Based simply on the fact that the Plan paid LJG's "provided for" claim, it does not follow that the Plan necessarily required LJG to release its lien upon satisfaction of the Proof of Claim. *Cf. Brawders*, 325 B.R. at 412–13 (finding that plan which only dealt with arrearages of a secured claim only limited what the secured creditor would be paid from estate and "did not purport to affect the underlying assessment debt to [the creditor] or its in rem rights").

Consistent with the court's earlier conclusion that the Plan did not eliminate LJG's rights to post-confirmation Fees and Expenses, the court concludes that LJG's lien rights too were left unaffected by the Plan. In support of this conclusion, the court also notes the Plan's treatment of liens securing Class 2 claims "[e]ach secured claim will *continue* to be secured by its *existing* lien." The court interprets this provision to mean the Plan did not modify the lien rights of a Class 2 creditor, such as LJG. This means that LJG's "existing lien" applied to all of its rights arising from the Note and DOT, including its rights to recover post-confirmation Fees and Expenses. Therefore, given the Plan's own language, LJG still retained its lien against the Restaurant despite completion of Plan payments, the entry of discharge, and the revesting of property in Eickerman. Since the Plan provided otherwise, the Restaurant did not vest in Eickerman free and clear of LJG's lien interest upon the entry of discharge.

**CONCLUSION.**

Based on the foregoing, the court finds and concludes that no triable issues of material fact exist that can or must be litigated in this adversary proceeding. When Eickerman defaulted on his obligation to make timely Plan payments and on his other obligations under the Note and DOT, LJG had the right to recover any applicable Fees and Expenses. As a result, completion of the Plan and entry of Eickerman's discharge

33

did not represent full satisfaction of Eickerman's obligation to LJG. The discharge released Eickerman from any personal liability to LJG on account of the debts "provided for" by the Plan, including the debts arising from pre-confirmation Fees and Expenses. However, LJG still holds a secured claim for any post-confirmation Fees and Expenses that it may recover pursuant to the terms of the Note and DOT, and that claim continues to be secured by the Restaurant.

Therefore, LJG is entitled, as a matter of law, to assert a claim based on its post-confirmation Fees and Expenses in Eickerman's Fourth Chapter 13. The amount of that claim is subject to triable issues of material fact, which must be adjudicated through the claim objection process in the Fourth Chapter 13 or liquidated in the State Court Action. Accordingly, Eickerman's motion for summary judgment will be denied, and LJG's motion will be granted. LJG shall submit a proposed form of judgment consistent with this memorandum decision. Once that judgment becomes final, this Second Chapter 13 shall be closed.

Dated: March _____22_____ 2012

W. Richard Lee
United States Bankruptcy Judge

1

## APPENDIX A: RELEVANT PORTIONS OF THE PLAN.

2

3

**(Page 1)**

4

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF CALIFORNIA**

5

In re: )                    Case No. 02-17096-B-13F
                  )
6

GARY URLICH EICKERMAN                    Motion Control # JRJ-2
                  )
7
                  )
                  )
8            "Debtor."
                  )
                  )
9

**SECOND AMENDED CHAPTER 13 PLAN**

10

**( . . . )**

11

12

**CHAPTER 13 PLAN**

13

Debtor hereby proposes the following Chapter 13 Plan effective from the date of the petition:

**I. Plan Payments and Term**

14

        In order to complete this plan, the future income of Debtor will be submitted to the supervision and control
of the Chapter 13 Trustee ("Trustee"). Debtor shall pay to the Trustee the sum of $ 2,423_____ each month
15    for ___60____ months [if the foregoing is left blank, refer to the "Additional Provisions" portion of this plan]. The
plan payments consist of all Debtor's projected disposable income. Unless all allowed unsecured claims are paid
16    in full, the plan shall not terminate earlier than the stated term or 36 months, whichever is longer. If necessary to
complete this plan, the term will be extended up to 6 months, but in no event will the plan exceed 60 months in
17    length.

**II. Classification and Treatment of Claims and Expenses**

18

        The claims and expenses owed by Debtor are classified and provided for below.  To be paid, creditors,

19

20

**(Page 2)**

21

including secured creditors, must file proofs of claim. The proof of claim filed by or on behalf of a creditor, not the
22    plan or the schedules, will determine the amount and character of the creditor's claim.  If a creditor's claim is
provided for by this plan and a proof of claim is filed, dividends will be paid based upon the proof of claim unless
23    the granting of a valuation or a lien avoidance motion, or the sustaining of a claim objection, affects the amount or
classification of the claim.  Secured claims not listed within Classes 1, 2, 3, or 4, and priority claims not listed within
24    Class 5 are not provided for by the plan.  Whether or not a proof of claim is filed, Debtor shall make ongoing post-
petition installment payments on Class 1 and 4 claims.

25

26

27

28

35

( . . . )

### B. Secured Claims

**Class 1. Long-term secured claims that were delinquent when the petition was filed and that mature after the last payment under the plan.** Home loans and car loans maturing after the term of this plan are typical Class 1 claims. Creditors holding Class 1 claims will retain their liens and security interests. Pre-petition arrears will be paid through the plan together with interest if required by 11 U.S.C. § 1322(e). If no interest rate is specified, 10% per annum will be imputed and paid on Class 1 claims. Other than to cure the pre-petition arrears, Class 1 claims are not modified by this plan.

( . . . )

**Class 2. Secured claims that are modified by this plan or that will not extend beyond its length.** This class includes any secured claim that has matured or will mature prior to the completion of the plan. It also includes any secured claim, regardless of its maturity date, that is modified as permitted by 11 U.S.C. § 1322 (b)(2)

**(Page 3)**

( . . . )

or (c)(2). Each secured claim will continue to be secured by its existing lien or security interest and will be paid its full amount or the market value of its collateral, whichever is less if permitted by § 1322(b)(2), together with interest. If no interest rate is specified, 10% per annum will be imputed and paid on all Class 2 claims.

| CLASS 2 CREDITOR'S NAME/COLLATERAL DESCRIPTION | CLAIM AMOUNT | MARKET VALUE of COLLATERAL | INTEREST RATE |
|---|---|---|---|
| 1.La Jolla Group<br>(to be paid at rate of $1,613 per month for 60 months) | $72,500 | $350,000 | 12% |
| 2. | | | |
| 3. | | | |

[In the column "Claim Amount" include the unmatured principal, the accrued but unpaid principal and interest through the date of bankruptcy, as well as other accrued and unpaid charges such as attorneys' fees and foreclosure costs. If the market value of the creditor's collateral is less than the amount of the claim amount, the market value will be paid provided a Motion to Value Collateral (see Attachment M-3) is granted. Any deficiency will be treated as a Class 7 general unsecured claim unless it is a priority claim classified within Class 5. If a motion is not granted, the amount in the proof of claim will be paid.]

**Class 4. Claims to be paid directly by Debtor or third party.** This class includes secured claims with due dates extending beyond the length of the plan, that were not delinquent when the bankruptcy was filed, are not modified by this plan, and will be paid directly by Debtor or by a third party with money or property that does not belong to Debtor or to the bankruptcy estate. Holders of Class 4 claims shall retain their liens and security interests. Because Class 4 claims are not modified, payments shall continue to be paid as they become due under the terms of the existing contract. Class 1 claims shall not also be included in Class 4.

( . . . )

**(Page 4)**

**( . . . )**

**(Page 5)**

### E. Order of Distribution Between and Among Classes

After confirmation of this plan, funds available for distribution will be paid by the Trustee each month in the following order: (1) the Trustee's monthly administrative fees; then (2) approved administrative expenses; then (3) the monthly payments set out in the Additional Provisions below to be paid on account of pre-bankruptcy arrears on assumed executory contracts and unexpired leases or on other claims; then (4) Class 1 pre-bankruptcy arrearage claims and Class 2 claims; then (5) Class 5 priority unsecured claims; then (6) Class 6 special

**( . . . )**

unsecured claims and Class 7 general unsecured claims. Within each distribution level, allowed claims shall be paid on a pro rata basis. Unless a claim objection is sustained or a motion to value collateral or a lien avoidance m otion is granted, distributions on account of Class 1, 2, 5, 6, and 7 claims will be based upon the amount stated in each claim holder's proof of claim rather than the amount estimated by Debtor in this plan.

### III. Miscellaneous Provisions

**A. Vesting and Possession of Property.** Any property of the estate scheduled under 11 U.S.C. § 521 shall [choose one]

       [ ]     revest in Debtor on confirmation.
       [X ]   not revest in Debtor until such time as a discharge is granted.

In the event the case is converted to a case under Chapter 7, 11, or 12 of the Bankruptcy Code or is dismissed, the property of the estate shall be determined in accordance with applicable law.

**(Page 6)**

**D. Dismissal.** If Debtor defaults in the performance of this plan or if it will not be completed within six months of its stated term, not to exceed 60 months, the Trustee or any other party in interest may move to dismiss the bankruptcy case. When the Trustee requests dismissal, he may use either of the procedures authorized by Paragraphs 7 or 8 of the General Order.

Additional provisions or alterations to this plan shall be set out below. If necessary, use another page. Changes to the preprinted language of this standard Chapter 13 plan or to its attachments will not be given any force or effect.

*The debtor's mother has agreed to loan sufficient funds to pay off the debtor's plan from proceeds she expects to receive from close of an escrow that is expected to close in 8 to 12 weeks. At that time, the debtor plans to pay this plan off in full.*

Attorney's Name, Address, and Phone Number:
J. Roderick Jarrett 559-225-5991

Dated: _____

Debtor's Signature

5 — 1 3 - 0 3

37

Gary Eickerman, Case No. Case No. 02-17096-B-13
Adversary Proc. No. 09–1297/DC No. HDN-4


Gary Eickerman
3491 N. Madsen Ave.
Sanger, CA 93657

J. Roderick Jarrett, Esq.
Attorney at Law
575 E. Alluvial Ave., #101
Fresno, CA 93720

Henry D. Nunez, Esq.
Attorney at Law
4478 W. Spaatz Ave.
Fresno, CA 93722

Don J. Pool, Esq.
Attorney at Law
7522 N. Colonial Ave., #100
Fresno, CA 93711

Michael H. Meyer, Esq.
Chapter 13 Trustee
P.O. Box 28950
Fresno, CA 93729-8950

Office of the U.S. Trustee
United States Courthouse
2500 Tulare Street, Suite 1401
Fresno, CA 93721